Good morning your honors. May it please the court, as has been noted we have 20 minutes we've agreed to divide it equally. I'd like to reserve three minutes for rebuttal. In light of the fact that I have seven minutes I'll try to get right to the point. In this case there were 31 people charged, ultimately 29 people pled guilty to went to trial. The government argues at great length in support of its position on a number of issues and there are of course a number of joint issues that will argue between us. The evidence was overwhelming. Anything that may have happened here that was potentially in error was harmless. In light of the number of pleas I can understand why that argument is advanced but it's not supported by the evidence. If we look at the evidence globally that was actually presented when two of the defendants did go to trial, what we know is the government through a series of witnesses sought to prove essentially two types of drug conspiracy, a cocaine conspiracy and a marijuana conspiracy, and they sought to prove those through the same witnesses. The government introduced evidence of significant amounts of cocaine being moved, being trafficked, of course all through words, all what I'd call phantom amounts, amounts that are acceptable if you believe the witnesses but no real cocaine. They did the same thing with marijuana, same witnesses, same testimony. Well lo and behold in evaluating those witnesses the jury found Antonio Rios not guilty of the marijuana conspiracy. The difference in the evidence on marijuana and cocaine as it relates to Mr. Rios is largely 103 grams of cocaine found in his car and that's why the search leading to the discovery of that evidence is so crucial to his ability to receive a fair trial. Again, through the government's witnesses, we have a marijuana conspiracy rejected, we have two attempted murders for which he was found not guilty, again all coming from the same witnesses who talked about cocaine or at least some of the same witnesses. That's why the search is so important. In regard to the search, in reviewing, thinking more, trying to boil down what I want to say to the court about the search, I would say this, the moment that Antonio Rios left Holland, Michigan on the day in question, a decision was made to search his vehicle. That decision was based upon a tip from an interested witness, someone trying to avoid indictment. When Mr. Rios left town, it was based upon a tip that he was going to Chicago. He was going to go to Chicago to do something illegal, pick up drugs. Well, he didn't go to Chicago. He went to Detroit and the authorities knew that he went to Detroit. They knew that he went on an overnight trip. They knew, again, from the moment he left, his vehicle was going to be searched. So whatever this court looks at to evaluate the appropriateness of the search, it was information that was known when his car pulled away from Holland, Michigan. But he was stopped, as I recall, for some traffic violation, right? He was. Okay. So the police under Wren and Supreme Court precedent are perfectly allowed to do that. Stopping him is something I can't quarrel with because he was speedy. He was going very fast. But Rodriguez says, if you're going to make that kind of stop, then you can conduct the business that is related to that stop. They did that. It's undisputed. He produced his license. He produced his registration. They reviewed those items. Everything was fine. They could have cited him. He didn't have any outstanding warrants. He had no reason to further the stop. They waited. So there was an extension of the time frame? Yes. That's right. How much was the extension? Was it to bring in a drug dog? Yes. And my key point, to answer your question, the extension of time in which to bring in the drug dog was not something that is – it was a matter of getting the dog from one exit relatively close. I think it was about 15 minutes. Not something that in and of itself is so offensive. What bothers me and what I think makes the search bad is that drug dog had been sitting and waiting with its handler, waiting for Mr. Rios to come back because, in fact, he was going to be stopped no matter what. Correct me if I'm wrong, but I thought the Supreme Court case, recent case, and maybe it is Rodriguez, says that you can't extend a search to go get a drug dog and bring it in, extend a time frame, but as long as the police are going through the normal process of looking at the license, checking for outstanding warrants, et cetera, then if the drug dog appears, then the drug dog can circle around the car. Is that the law? And then what's wrong with the search here if that is the law? They were done and they could have released him before the drug dog. They were done with everything? Yes. And that's in the record somewhere? We have a very large record here. Yes, Your Honor. So – On a time frame basis, where does the record show the time difference was? It was not a long time. When the dog came. It was not a long time. It was, I believe, about 15 minutes. I'm going to look at that when I sit down, but I believe about 15 minutes. So isn't there a case that says that that is impermissible then? And what case is it? Well, there's – I don't have a case that says that a 15-minute time period is impermissible. My position is that it's an extension of Rodriguez because, in fact, the work was done related to the traffic stop and, in fact, the extension was solely for the purpose of getting the drug dog there. But here, the real distinction is, you know, in the normal case, the police have some reason when they make the stop, they have some reason to call the canine. Which, in this case, was the tip. It was, Your Honor, and that's why I've attacked the tip. That's why I've attacked the tip as being improper because – or inappropriate for a stop because, in fact, not only was there information about the tipster being a party with an interest here, in fact, the information provided was all wrong. Well, not all. It was wrong in terms of going to Chicago versus Detroit. I'm sorry, Your Honor. I would – That's the only thing that was wrong that we know of, right? And that, to me, is the only thing that mattered. The only thing that mattered because nothing else was proven to be true except that he picked up a passenger. I mean, the whole point was he's going to Chicago to meet his connection and, lo and behold, he goes to Detroit. I see that my time is up. Thank you. Thanks. While you're sitting down, if you could come up with what case you think is the best case to show that this search is – that the delay of 15 minutes to get the drug dog there is too much under the Constitution, if you would think of that case would be good. Good morning, Your Honors. Mary Chartier on behalf of Mr. Casillas, and if it may please the Court, I would like to reserve two minutes for rebuttal. Right. Thank you, Your Honors. As Mr. Graham pointed out, we have a number of issues. Today, I'd like to focus on three. One that relates to the trial, and that is the District Court's changing of the pattern jury instruction regarding reasonable doubt, and two that relates to Mr. Casillas' sentencing. One related to the classification of an assault as an assault with intent to murder Mr. Olivares, as opposed to an aggravated assault, and the other with the imposition of two additional points for criminal livelihood. As this Court is well aware, there are pattern jury instructions that District Courts are not required to follow, but they are strongly encouraged to follow. The pattern jury instructions encapsulate the fundamental concepts of due process that every defendant is entitled to when they go to trial, especially in a case like this where so much of the evidence did not directly relate to Mr. Casillas or Mr. Rios. Those fundamental principles are so critical. The pattern jury instruction for reasonable doubt indicates that the proof has to be so convincing to the jurors that they would not hesitate to rely on it in making one of the most important decisions in their lives. The District Court changed that to one of, or excuse me, to an important decision in the jurors' lives. This was objected, oh. Is there any case pro or con your position that this is an impermissible change in the jury instructions? No case that directly contrasts that sort of wording, but in response to the government's motion, or excuse me, the government's response, we talk about other cases from the court. So for example, Wilson v. United States, which is a United States Supreme Court decision, 232 U.S. 563. In that situation, the court changed the jury instruction wording and used the determination or the phrasing, an important decision, but in that situation, the court said that the jurors could find reasonable doubt if it meant that low bar. So for example, the jurors could find reasonable doubt if considering merely an important decision in their lives. And that's a direct contradiction to what the District Court did here. Because in Wilson, the court put its stamp of approval on that language when the jurors would say, I would have a reasonable doubt in making an important decision in my life. What the District Court did is directly contradictory to that and said you can convict Mr. Casillas and Mr. Rios if only you pass that very low threshold of an important decision. That, I think, is one of the strongest cases to show that the language chosen by the District Court was improper in this case. I'm sure this court is well aware of the most important decisions in your own lives. Generally, they relate to things such as marriage or children. An important decision in my life might be hiring a new attorney at the firm. Certainly not a decision of the same weight and magnitude as one of the most important decisions in my life. The phrasing, I think, is selected because it conveys to the jurors that there has to be an extremely high level of certainty before you strip a man of his liberty. Ma'am? Yes. Normal practice, as you've indicated, would be to use the pattern instruction. Yes. I'm curious how it came about that Judge Neff utilized a modified instruction. It was actually Judge Bell, just for the court's clarification. So when the court had, we had submitted our proposed jury instructions, both to the government and Mr. Rios and Mr. Casillas, and then the court gave us a packet before closing argument of what it wanted to read to the juries. When we went through there, because I had actually prepared my closing argument using one of the most important decisions in a juror's life, because it conveys that level of certainty and how serious this is for jurors, because it definitely is, I think, one of the most important decisions in a juror's life, to strip a person of liberty, to convict them of very serious crimes. We objected to that with Judge Bell, and the court indicated that it did not care for the wording selected in the pattern jury instructions, that it believed that jurors wouldn't know what one of the most important decisions in their lives would be, but all the jurors would be able to focus on an important decision in their life. And I think that, again, that shows the error, because there are many important decisions that we make in our lives, many in a week, many in a month, but there are very few that rise to that level of the most important decision. Has this district judge, who's obviously an experienced one, has he used this different instruction before, to your knowledge? Not that I'm aware of, but this was my first trial in front of Judge Bell, so I had not faced that issue with him. I have had trials in front of other district court judges in the Western District. They all use the pattern jury instruction. So this is the first time that it's been changed in one of my trials. As Mr. Graham pointed out, this case, there was tremendous amounts of evidence that did not relate to Mr. Rios or Mr. Casillas. So for example, one of the other issues is, and the court is well aware, the very first witness by the government was a national gang expert who'd never heard of the Holland Latin Kings, which Mr. Casillas and Mr. Rios were members of, and he testified about national Latin King policy procedures issues. Their next witness was a gentleman from the Latin Kings in Chicago who said he lost count of the number of murders he had committed after he got to 20. Again, vastly different than the drug conspiracy charges that Mr. Rios and Mr. Casillas were involved in, and the assaults that they were involved in. So when the jury starts out hearing this sort of information, and then the end of the trial has that lower threshold, the conviction violates Mr. Casillas' due process rights. As I see my time is moving quickly, I'd like to move on to at least one of the sentencing issues. Those witnesses testified, did you ask for any kind of cautionary instruction at that time? We had filed a motion ahead of time asking to preclude the gang experts, both. But he didn't, so did you ask for an instruction that says this does not, this evidence does not apply to defendant A and B? We had objected to that evidence coming in during the trial, and the trial court overruled us. We did not ask for another jury instruction because the court had already deemed it to be relevant to Mr. Casillas and Mr. Graham, or excuse me, Mr. Casillas and Mr. Rios. As it relates to the assault with intent to murder Mr. Olivares, that was not put to the jury. So unlike Mr. Rios, who had both assaults put to the jury and was found not guilty of both of those, Mr. Casillas' assault was not put to the jury. The district court found at sentencing by a preponderance of the evidence that the assault on a gentleman named Mr. Olivares that occurred in Texas rose to the level of assault with intent to murder. Where the district court made its mistake is determining that a reckless disregard for a person's life, which it said that Mr. Casillas had, rose to the level of scoring this as an assault with intent to murder. The sentencing guidelines are clear. It has to be willful, deliberate, malicious, and premeditated. And it only is scored as an assault with intent to murder if the person had died. It would have been a first-degree murder. So all four of those aspects would have needed to have been met. In this case, the district court used the phrase reckless disregard three times and says that a reckless disregard for human life almost rises to the level of an intent to murder, but almost is not good enough under the law. There's so many instances, so correct me when I'm wrong, but I thought that you're talking about with respect to the Olivares matter. I thought that there's testimony that Howell heard Olivares gargling in his own blood and then Casillas said, yeah, motherfucker, die, motherfucker. That's correct. Okay, so why wouldn't that be enough to show that Casillas intended that Olivares die? For a number of different reasons. Mr. Casillas assaulted Mr. Olivares with his hands and his feet. This was not a premeditated killing. It was situational. He did not know that Mr. Olivares would be at the same location that he was. Mr. Olivares was released from jail. He was taken to a party at another home. Mr. Casillas happened to be there. Mr. Casillas knew that Mr. Olivares was still alive when he stopped assaulting him. Now, I'm not saying hooray for Mr. Casillas that he assaulted Mr. Olivares, but he did not kill or intend to kill Mr. Olivares. If he had wanted Mr. Olivares to be dead, quite frankly, he would have kept on going. This wasn't a situation where there was a drive-by shooting. I shoot my gun, but I don't know if I hit someone. Mr. Casillas knew when he stopped that Mr. Olivares was still alive. But I thought that he stopped when there were other people around, so there could have... I guess I'm wondering, if the test is preponderance of the evidence, why isn't there enough here for the district judge to make this conclusion? There were always people around, so it's not like Mr. Casillas and Mr. Olivares were isolated. There were always people in that vicinity, including the witness who said he heard Mr. Casillas make that statement. Mr. Olivares' wife testified for the government, and she said she was there. She heard Mr. Casillas swear, but she did not hear him make that statement. No one stopped Mr. Casillas. No one tried to stop Mr. Casillas. He stopped on his own. He knew Mr. Olivares was still conscious. He knew Mr. Olivares got in a motor vehicle and was going to get medical help. He never sought to try and stop them from doing so. If Mr. Casillas has wanted to kill Mr. Olivares, quite frankly, he would have kept going, or he would have stopped him from going to seek medical help. When Mr. Olivares did go seek medical help, he removed himself from the vehicle and put himself in the ambulance. But the other critical point is that the district court, even by a preponderance of the evidence, did not find that Mr. Casillas intended to kill Mr. Olivares. The court said that it found that Mr. Casillas evidenced a reckless disregard for Mr. Olivares' life, and the court used that phrase three times. So even if we look at the court's finding and it is not something where I can attack it via preponderance of the evidence, the court never found the intent to kill. The court found reckless disregard. You're saying that reckless disregard is not enough? Correct. Because the sentencing commentary and the sentencing guidelines require willful, deliberate, malicious, and premeditated. Reckless disregard, including a case from this court, reckless disregard is sufficient for involuntary manslaughter. It is not sufficient for first degree premeditated murder. So the court's finding of reckless disregard makes this an involuntary manslaughter had Mr. Olivares passed away, which means that he should have been scored as an aggravated assault, and that would impact his sentencing guidelines. Because the assault on Mr. Olivares was the driving force, because of the base offense level, and then if this court were to find that the trial court erred, then the driving base offense level would be related to the drug conviction, and that would impact the sentencing guideline range that Mr. Casillas fell into. Thank you very much. Thank you, Your Honors. Good morning. May it please the court, Sally Behrens on behalf of the United States. I'll start, I guess, in the order that the defendants have presented their arguments, beginning with Mr. Rios and his argument regarding the suppression issue. I think it's important to realize here that in the affidavit that was presented for the search warrant of the GPS location of the phone, the tip was not merely that a credible informant had said that Antonio Rios was going to pick up his girlfriend, Candy Rodriguez, and go to Chicago to get drugs, although the informant did say that. The informant also, however, said that the CI has stated, the affidavit said that the CI has stated that he is aware of several trips Rios has made to Chicago, Detroit, where he brought back over nine ounces of cocaine. So that the defendant went to Detroit does not in any way implicate the probable cause that existed that he was going on a drug run to go pick up drugs to bring them back to Holland, Michigan. At the very least, even if you don't find that there's probable cause in this case, there was certainly a reasonable suspicion upon the stop that would allow, even under Rodriguez, an extension of the stop in order to run the dog around the car, where it made a positive hit, giving officers absolutely probable cause to search the car. So you're saying that because of the tip, there was at least reasonable suspicion that would allow an extension. So you're not arguing that it was for speeding? I think that is our primary argument. However, I would also submit to the court that in the suppression hearing that the district court conducted, the testimony of Detective Haglund, who was the affidavit for the search warrant, but also the main officer who was working on the surveillance, he testified that he immediately called the canine handler who was at exit, the next exit up the highway on 196 from where the stop took place. He called him immediately upon the stop, and the dog handler testified that he responded in approximately five minutes. So it is not clear from the record that the stop was completed and that Mr. Rios was free to go at the time that the canine was run around the car. That's based just on the suppression hearing. Also, in the materials that Rios submitted to the court, he included, in support of his suppression motion, he included the officer's report for the trooper that stopped the vehicle. And the trooper indicated that he asked Mr. Rios a series of questions about where he was going and was given contradictory and inaccurate information that Mr. Rios then changed, which would also support an extension of the stop in order to run the dog around the car. In sum, there was at least reasonable suspicion, if not probable cause, to extend the stop and run the dog around the car. That is largely the suppression issue, although I would like to respond briefly to the harmless error argument. Mr. Graham essentially conflates the evidence that was presented on cocaine and conspiracy charge, which was part of one of the underlying acts in the RICO charge, was only different from the marijuana conspiracy as to his client in that they found cocaine in the stop with Mr. Rios. That's not true. There was substantially more evidence of cocaine and cocaine trafficking by the Holland Latin Kings, of which Mr. Rios was a member over the course of the trial that was presented. Unless the court has additional questions about the stop, I'll move on to Mr. Casillas' arguments. The first of those is the reasonable doubt instruction. We have in our brief cited a number of cases that use varying language regarding reasonable doubt. This court has never said that the pattern jury instructions are some talismanic incantation that must be said over the jury. But it does seem like there's a real difference between saying the most important decisions of your life versus an important decision. Isn't there a big difference? I don't think there's a big difference. And I think that the standard that the court has to apply is whether or not the district court lowered the burden of proof. And that has to be looked at in the entirety of the instruction that's given. And it's worth remembering that this is a two-paragraph instruction regarding reasonable doubt. The court can look at it, so I won't read it. But there are at least five sentences that discuss the concept of reasonable doubt. Moreover, numerous courts have talked about an important decision in your life or an important decision in your business affairs, which seems less than what the court gave here. I think... So what are your best cases for saying that this is constitutionally sufficient? Baker v. Corcoran, the Fourth Circuit case, which is 220 F. 3rd, 276. In that case, the Fourth Circuit approved in an important matter in your own business or personal affairs. I believe in that case it's also the willingness-to-act language as opposed to the hesitate-to-act language. I understand that the courts have made some distinction between those two. And in here, the Sixth Circuit pattern instruction is a willingness-to-act language instruction as opposed to a hesitate-to-act instruction. Similarly, Vargas v. Keene, which is a Second Circuit case, 86 F. 3rd, 1273, talks about important business affairs. Again, that seems like less of a standard than an important decision in your own life. We've cited a number of cases in our brief that talk about an important decision as being a standard that has been approved by the courts. On the assault with intent to murder issue that Ms. Chartier raises, it is clear from the sentencing transcript that the district court credited the testimony of the defendant, Mr. Casillas Seavey, I hope you choke on a die motherfucker language that is evident from the record. Judge Bell credited that testimony. And this court can affirm on any basis supported by the record. First of all, I guess there's the question, what has to be shown? And it's an intent to kill, right? Yes. So if you're punching somebody and you say, die, I hope you die, is that enough to show intent to kill? Or could it be just that you're angry at the person? I'm now hypothesizing way outside of the facts of this case. But you could imagine people getting in a fight and somebody punching somebody and not intending to kill them, but saying, I hope you die because they're just so angry. Absolutely, you could. However, in this case, remember that this man did almost die. He had to be airlifted to a hospital. One of his ears was almost torn off. He was gravely injured and but for the intervention of medical technology would have died. That was the testimony, I believe, at trial. But your opponent, I think, was at least alluding to the idea that he walked to some ambulance or he walked somewhere. I don't recall that from the record. Like the court, this is a voluminous record and I don't want to make a representation on that front. But my recollection is that he was actually airlifted and there was testimony from his treating the doctor at the emergency room at trial regarding the graveness of his injuries. Is there a problem that the district judge apparently was using a recklessness standard as opposed to an intent to kill standard? I would say that the district court, at worst, his language was somewhat ambiguous in terms of the standard that's used. He was responding, just as this court has, to Ms. Chartier's argument, which was, look, he could have finished him off. He was right there. He could have finished him off and he walked away. And the district court, on my reading of the record and what I recall from the sentencing, said that, well, he was being reckless in his response to the leaving this man to die. But that, unlike in most cases, we actually have a verbalization here of the intent to kill Mr. Olivares. And that by itself is sufficient to demonstrate intent. Ms. Chartier also talked about the testimony of Officer Bavacqui and Mr. Vargas. I'd like to remember that in this case, the defendants were indicted as members of the Almighty Latin King Nation, the national organization. And there was testimony that linked the overarching national organization to the Holland Latin Kings. Chicago is the base for the Almighty Latin King Nation. And there was testimony from Mr. Vargas that he traveled to Michigan as an organizer, that he traveled with Eric Rubel, who is the head of the Holland Latin Kings group or chapter, and traveled with him to Iowa to go organize another chapter of the Latin Kings. There was testimony by other members of the Latin Kings that they went back and forth from Chicago in order to procure drugs and that the Chicago Latin Kings were a source of the drugs. So the message in the briefs by the defendants is that the information that was given about the Latin King Nation was irrelevant and prejudicial, but it was intrinsic to the case and that the Holland Latin Kings didn't exist in a vacuum. They were part and parcel of a greater organization. Now, there are a lot of issues in this case, as the court has said, and I want to be responsive in responding to questions that the court has for me. I think we've read the briefs very carefully and have looked at the record and appreciate that each side will be relying on the briefs for any issues that have not been discussed in oral arguments. Well, then, unless the court has other questions, I will submit. Thank you. Thank you. I had a chance to look at the record and in regard to the question of how long was it before there was a stop and then the K-9 unit arrived, it appears that all of the relevant evidence is at page 7020 and the time period according to the officer, the K-9 handler, was that it was five minutes. It was five minutes from the time the K-9 officer was called until he arrived. Then there's testimony according to your opponent that he was called immediately upon the stop. There is testimony as to that. However, at page 7026, there was an undisputed proffer regarding the presentation of the license and the registration. So, whether those facts... Usually, when the police stop somebody, it's my understanding that it takes a little while for to check the license and registration on the computer that they have in their police car. Well, it could, but it was... Because in this case, there was going to be a search no matter what, there wasn't testimony from the officer regarding exactly... For example, did he run the plate from his car before he went and got the information? We just don't know because, again, they were waiting and this K-9 officer was waiting since 7 a.m. for Mr. Rios and the stop was made at 1 p.m. So... Your opponent argues that even if it did extend the search, that because there was reasonable suspicion based on the tip, that that was enough to extend the search purposefully. And I disagree with that because, in fact, it's undisputed that this was an interested witness. It is undisputed that, in fact, he claims he overheard a conversation, and that conversation was, we're going to Chicago, and they, in fact, went to Detroit. This generalized suspicion... I guess my point is, I don't think the generalized suspicion... And the police did suspect Mr. Rios and many others of being Latin King members at this time, most certainly. But I believe the information was so inaccurate that it did not rise to the level of allowing any type of further activity beyond the stop. And then you asked me, point blank, Judge Moore, about the case. It's just Rodriguez. There is no case that has interpreted it that I can cite to, so thank you. Thank you. One point of clarification, Mr. Casillas and Mr. Rios were indicted because they were alleged members of the Holland Latin Kings. That actually had been an issue that came up when we had jury instructions being read. The indictment specifically was only about them being members of the Holland Latin Kings. As it relates to the reasonable doubt jury instruction, two paragraphs or not, reasonable doubt is the standard that juries have got to meet in order to convict a man and strip him of his liberty. And in one of the cases cited by the government, Baker v. Corcoran from the Fourth Circuit, while the court had referenced an important matter in the jury instructions, it then went on to convey to the jury that they needed to consider the more that put its stamp of approval on lessening the reasonable doubt standard to only an important decision as opposed to one of the most important decisions. We all do a lot of trial work. All three of us, we all know each other very well. Jurors take the jury instructions extremely seriously, in my opinion. And whether, again, it's two paragraphs or two pages, the juries focus on the court has instructed them to do. And here, the court lessened the certainty that a juror needs in order to convict two men and have them stripped of their liberty. As it relates to the Mr. Olivares assault, Mr. Olivares was, he got into a motor vehicle, just so I'm clear, and he was driven about a half a block to a convenience store. And then 911 or an ambulance was called. He waited in the parking lot with his wife. When the ambulance got there, he walked himself to the hospital. While he was in the hospital for a few days, he was released with absolutely no restrictions. And the sentencing guidelines are clear. Life-threatening injury does not equate to an intent to kill. Mr. Casillas was scored and enhanced seven levels because there was a life-threatening injury to Mr. Olivares, but that does not equate to an intent to kill. And whether the district court was replying to an argument that I made or not, it used the reckless disregard language three times and said, and this is a quote, now in referring to reckless disregard, that's almost as much as saying an intent to kill. Certainly reckless disregard for the life of another person. The court had indicated that's the close call. But almost having an intent to kill is not the same as having an intent to kill. And that's what's required to enhance that scoring for Mr. Casillas to assault with intent to murder. So if the district judge was mistaken as to the standard and thought that it was reckless disregard and says almost intent to kill, would the proper remedy be to vacate and remand so the district judge could re-evaluate this evidence and decide whether there was an intent to kill or not? No. With all due respect, Your Honor, I think the proper remedy would be to remand for re-sentencing on the fact that the court already determined that Mr. Casillas exhibited a reckless disregard, and then it would just be a mere recalculation of the... But if the district judge is mistaken as to what he's supposed to be finding, why shouldn't we give him a chance to make the correct, to know what the law is and apply it? The court, I believe, took all the facts, and the court was the one who heard all the evidence at trial and heard our arguments at sentencing. So the court evaluated all the evidence. The court then found that Mr. Casillas had exhibited a reckless disregard. The court believed that it could take that and then extrapolate out and to determine that reckless disregard equals assault with intent to murder. But the court already found that Mr. Casillas' mindset was a reckless disregard, and it already said it's close to an intent to kill, almost as much, but not as much. I don't think that it would be correct when the court has already determined... With the word almost, so depending on your inflection and so forth, to say what you're saying or to just say, same thing. You know, you can say, it's almost the same thing, something like that. So my point being, if we agree with you, why shouldn't we send him back for resentencing, and he can make whatever findings he thinks is appropriate? Because the court already made its finding? That's not the end, is it? It should be the end in this regard, because the court will have a chance to resentence Mr. Casillas if the sentence it imposed was proper, or will... It would want to restrict him to the language he used, and he can't find anything else in the record. Because... I don't think there's any law that says that's... Because the court already determined that Mr. Casillas' mindset was reckless disregard. And we get back to what I said about almost. If the court had wanted to find an intent to kill, it had the opportunity to do it at that point in time, when the evidence had already been presented to the court. Well, I understand your argument. Thank you, Your Honor. Thank you. Thank you all for your argument. And Mr. Graham and Ms. Chartier, I understand that both of you are appointed pursuant to the Criminal Justice Act, and we thank you for your representation of your clients in the interest of justice. We thank you all for your argument. The case will be submitted, and the other cases that are set for today will be submitted. We have a number of cases on the briefs. And would you... Would the clerk adjourn court, please?